**David K. McGOWAN, Ted R. French Irrevocable Trust, Suzannah McGowan Johnson, Adele McGowan Hudgins, James A. Phyfer, Jr., and Tally Phyfer McCormack, Plaintiffs,**

v.

**CAPITAL CENTER, INCORPORATED, Leland R. Speed, and City of Jackson, Mississippi, Defendants.**

**No. 3:96CV595LN.**

United States District Court,
S.D. Mississippi,
Jackson Division.

Feb. 19, 1998.

*MEMORANDUM OPINION
AND ORDER*

TOM S. LEE, Chief Judge.

The plaintiffs in this cause, David K. McGowan, Ted R. French Recoverable Trust, Suzanne McGowan Johnson, Adele McGowan Hudgins, James A. Phyfer, Jr. and Tally Phyfer McCormack, have filed a motion for summary judgment by which they seek an adjudication that the "tax" authorized by the Mississippi Business Improvement Districts Act, Miss.Code Ann. § 21–43–101 *et seq.*, violates both the Fourteenth Amendment of the United States Constitution and Section 112 of the Mississippi Constitution. The State of Mississippi [1] and City of Jackson, defendants, have responded in opposition to the motion and have filed their own motion for summary judgment in which they argue that because the assessment authorized by Miss.Code Ann. S 21–43–123 is not a tax at all but rather is a special assessment, the constitutional requirement that property be assessed for taxation under general laws and by uniform rules is not implicated and plaintiffs' arguments to the contrary must be rejected. The court has now considered the memoranda of authorities submitted by the parties, and concludes that plaintiffs' motion must be denied for the reasons which follow.

Earlier in this cause, this court entered an opinion setting forth in detail the facts giving rise to this lawsuit and explaining the plaintiffs' claims herein, in language substantially as follows.

## I. The Facts

In 1995, upon finding that the deteriorated condition of the business districts in many of the state's municipalities was inimical to the economic and general welfare of the state's citizenry, the Mississippi Legislature passed the "Business Improvement District Act" (the Act), providing therein for the establishment and operation of "business improvement districts" as a means of restoring and

David K. McGowan, Jackson, MS, for Plaintiffs.

John Chase Bryan, Watkins, Ludlam & Stennis, and Leland R. Speed, Hugh W. Tedder, Jr., Office of City Attorney, Jackson, MS, for Defendants.

1. Though not originally named as a defendant in this litigation, the State of Mississippi was allowed to intervene as a defendant for the limited purpose of defending the constitutionality of the Mississippi Business Improvement District Act, Miss.Code Ann. § 21–43–101 *et seq.*

promoting business activity in these areas. Miss.Code Ann. § 21–43–101, *et seq.* The Act, as written, contemplates and prescribes procedures for the voluntary formation of such business improvement districts by owners of non-residentially zoned contiguous property within a municipality who collectively devise a "district plan" for improvements to the "appearance and economic functioning" of property within their districts, ranging from fire prevention and security services to parking, sidewalks, parks and landscaping. Miss.Code Ann. § 21–43–105(d), and § 21–43–107 *et seq.* The Act envisions that the improvements planned by and for a district will be funded through an assessment for each property included in the district, over and above the ad valorem tax assessed against the property, which assessment is "based upon gross square footage of buildings and unimproved real estate." Miss. Code Ann. § 21–43–123(2).

Immediately upon passage of the Act in 1995, efforts were undertaken to create a business improvement district in the downtown Jackson area, spearheaded by Leland Speed and CCI. In accordance with the procedures established by the Act, a petition was delivered to the Clerk for the City of Jackson signed by twenty percent of the property owners in the area proposed to be included in the district, Miss.Code Ann. § 23–43–113, following which notice was given to the remaining property owners in the proposed district of a meeting to develop a district plan. The meeting was held, at which time a district plan was devised and agreed upon by a majority of the property owners attending the hearing. *Id.* This plan provided that owners of all real property within the proposed district, including both buildings and unimproved land, would be assessed a tax of $.09 per square foot which would be collected by the City of Jackson and disbursed to CCI, which was selected to manage the district for the initial term of five years.[2] Miss.Code Ann. § 21–43–113(f).

Upon written notice to the Clerk of the City of Jackson, a public hearing was held concerning the proposed plan, followed by a special election of the property owners in the proposed district. In the election, the plan was defeated, for while a majority of the affected property owners—sixty one percent—favored the plan, the Act requires that a proposed plan receive approval by seventy percent of the property owners.

After the plan initially failed, the proposed district was reconfigured to create a smaller district in which more of the property owners favored approval of a downtown Jackson business improvement district. In other words, according to the complaint, CCI and Speed put forward for consideration a plan identical to that originally proposed except that to assure adoption, there was excised from the second proposed district a sufficient number of property owners who had opposed the district as originally drawn. Again the steps prescribed by the Act for election were followed with the result that the District and district plan were approved by the requisite majority, i.e., more than seventy percent of the affected property owners. Thus, the Jackson Business Improvement District (the District) became effective January 1, 1997.

## II. Plaintiffs' Complaint

The plaintiffs in this case are members of a family who jointly own a parking lot in downtown Jackson that is located within what became the District. Former defendant Leland Speed, who, like plaintiffs, owns real property in downtown Jackson within the District, is the president and chairman of the board of defendant Capital Center, Inc. (CCI), a private nonprofit corporation comprised of certain owners of real property in the downtown Jackson area which was selected to act as the "business management group" for the District. Plaintiffs filed this action seeking declaratory, injunctive and monetary relief against Speed, CCI and the City of Jackson based primarily on allegations that their rights to equal protection have been violated by their inclusion in the District and more particularly by taxes imposed on them by virtue of their inclusion in

---

**2.** CCI is a nonprofit corporation, the board of which is comprised of downtown Jackson business owners, whose purpose is "to provide sup-

plemental services to improve the downtown area."

the District.[3] They reason that this tax is discriminatory, because:

> [U]nder the said plan, commercial properties lying within the district which have a high value—and produce significant income—will be taxed at the same rate—based on square footage only—as the district properties which have little value, and produce little or no income.
>
> Consequently, properties of less value and which produce less income will bear a disproportionately higher portion of the total additional taxes assessed in relation to value. Plaintiffs would show that the tax is "regressive"—that is, the higher the value of the property, the less the tax in relation to value. Plaintiffs allege that the tax is discriminatory as regards lower valued and lower income producing properties.

According to the complaint,

> Leland R. Speed and the other downtown property owners which comprise the CCI are for the most part owners of high value—high income production—commercial properties which will pay very little additional tax in relation to their value. Said Defendants propose to fund their scheme, in a large part, through assessment of disproportionately high additional taxes on lower valued, lower income producing properties—such taxes being as much as sixty times as high—in relation to property value—as the taxes imposed upon Mr. Speed's property under the plan. Defendants CCI and Speed will derive extensive benefit as a result of adoption of the plan at the expense of property owners who cannot afford to pay additional taxes.

As relief for these claimed wrongs, plaintiffs sought a declaratory judgment adjudicating that the Business Improvement District Act is unconstitutional and void, and that therefore, the Jackson Business Improvement District established pursuant thereto is void. They also asked that the court "[p]ermanently enjoin the City of Jackson, Mississippi, from assessing or collecting any of the taxes provided for in the said downtown development district plan, or imposing any liens for the same," or that "[a]lternatively and/or cumulatively," they be awarded a money judgment against all defendants "for damages equaling the additional taxes to be imposed upon Plaintiffs for the term of the business district (5 years)." Additionally, they demanded punitive damages and attorney's fees.

## III. The Parties' Motions

By its earlier opinion in this cause, the court dismissed plaintiffs' various claims against Speed and CCI. Plaintiffs have now filed their motion for summary judgment against the City and State contending that based on the undisputed facts, there can be no doubt but that because the Business Improvement District Act provides for the assessment of a tax against the owners of real property within the geographic area encompassed by the Jackson Business Improvement District based not on the value of the property but on square footage, irrespective of the value of that square footage, the Act is therefore, as a matter of law, discriminatory and violative of Article 4, Section 112 of the Mississippi Constitution, which mandates that "[t]axation shall be uniform and equal throughout the state," and which provides that "[a]ll property not exempt from ad valorem taxation shall be taxed at its assessed value." Plaintiffs further contend that on the undisputed facts, the court must agree and conclude that the Act also violates the Equal Protection Clause of the United States Constitution because it permits the assessment of a tax against certain property owners, i.e., those within a business improvement district, for the primary purpose of providing services that the City of Jackson is already providing and is required to provide to *all* property owners from the proceeds of real estate ad valorem taxes. In response to plaintiffs' motion, the State has filed a cross-motion for summary judgment in which it contends that

---

**3.** Plaintiffs also alleged in their complaint, *inter alia,* that CCI and/or Speed, through the instrumentality of CCI (which he in effect controls), orchestrated the passage of the Business Improvement Districts Act, as well as the subsequent formation, by means of unlawful "gerrymandering," of the Jackson Business Improvement District. The court has previously dismissed plaintiffs' claims against Speed and CCI.

the "tax" which plaintiffs purport to challenge in this suit is not a tax at all, but rather is a special assessment which is not subject to the uniformity provisions of the state constitution.[4] And it submits that since the assessments are intended to fund services specifically for the benefit of those included in the District, then it is certainly reasonable, from an equal protection standpoint, to distinguish between those who are located within and without the District.

Plaintiffs make a compelling argument in support of their contention that the levy authorized by Mississippi's Business Improvement Districts Act fails to satisfy the uniformity requirement imposed by § 112 of the state constitution, and if the levy so authorized were construed to be a tax, then the court would likely find merit in plaintiffs' position. If, however, the levy were not in fact a tax but rather a "special assessment," then plaintiffs' challenge to the levy under the state constitution would fail since, as the parties agree, a "special assessment"—as distinguished from a "tax"—is not subject to the requirement imposed by the state constitution that *taxes* be assessed uniformly as a percentage of value. The parties also appear to agree, implicitly if not expressly, that if the levy were considered a special assessment for services intended for the benefit of those within the District, then plaintiffs' equal protection challenge would fail. As plaintiffs succinctly put it, then, the case does boil down to the question of whether the levy is a tax or whether it is a special assessment. And while the court will acknowledge that the correctness of its answer to this question is not completely free from doubt, it is the court's considered opinion that the levy at issue is a special assessment, or at least that in purpose it more closely resembles a special assessment than a tax and thus falls outside the constitutional uniformity requirement applicable to taxes.

Plaintiffs' argument proceeds from the premise that special assessments are distinguished from ad valorem taxes in that ad valorem taxes are imposed as a means to fund general governmental services, such as police and fire protection and trash collec-

tion, whereas special assessments are utilized *solely* for the purpose of funding, or defraying the costs of specific, finite, physical, permanent local improvements, such as the construction of roads, and sewer and water systems. The distinction is not so clear, however, as plaintiffs would have it. It is true, as plaintiffs point out, that the vast majority of cases which have discussed special assessments have tended to deal mainly with assessments that have been made to fund specific capital improvements. But the underlying rationale for distinguishing "special assessments" from "taxes" relates not so much to the particular "improvement" involved as to the particular benefit of the improvement—whether or not a tangible benefit—to the persons against whom the assessment is made. In an oft-quoted passage, the Supreme Court, quoting Cooley on Taxation, explained in *Illinois Central Railroad Co. v. Decatur*, 147 U.S. 190, 198–99, 13 S.Ct. 293, 294, 37 L.Ed. 132 (1893), as follows:

"Special assessments are a peculiar species of taxation, standing apart from the general burdens imposed for state and municipal purposes and governed by principles that do not apply generally. The general levy of taxes is understood to exact contributions in return for the general benefits of government, and it promises nothing to the persons taxed beyond what may be anticipated from an administration of the laws for individual protection and the general public good. Special assessments, on the other hand, are made upon the assumption that a portion of the community is to be specially and peculiarly benefitted, in the enhancement of the value of property peculiarly situated as regards a contemplated expenditure of public funds; and in addition to the general levy, they demand that special contributions, in consideration of the special benefit, shall be made upon the persons receiving it. The justice of demanding the special contribution is supposed to be evident in the fact that the persons who are to make it, while they are made to bear the cost of a public work, are at the same time to suffer no pecuniary

---

4. The City has joined in the State's motion.

loss thereby, their property being increased in value by the expenditure to an amount at least equal to the sums they are required to pay. This is the idea that underlies all these levies."

*See also id.* ("the charges are for a local improvement, and cast upon the contiguous property, upon the assumption that it has received a benefit from such improvement, which benefit justifies the charge"). With this understanding of the rationale supporting special assessments, several courts have specifically found that assessments of the type at issue in this litigation are not taxes but rather are special assessments, or are more akin to special assessments than to taxes. In *Williams v. Anne Arundel County, Md.*, 334 Md. 109, 638 A.2d 74 (Md.1994), for example, the court found that the authorization for assessments for "maintenance of community property, including lawn care, trash removal, repair, lighting, paving and erosion prevention; special security for community property; acquisition, improvement, and construction of real and personal community property; and funding administrative expenses incidental to carrying out these purposes, including mailing, secretarial, auditing, insurance and legal costs," were not taxes but rather were "special benefit assessments," or special assessments. *Id.* at 78. In so holding, the court observed that "[a]lthough special benefit assessments were first utilized to finance certain capital improvements, typically elements of the infrastructure of local government, special benefit assessments may also be used to finance the operating expenses of local government for services beneficial to property in an area." *Id.*

Like the plaintiffs herein, the plaintiff in *City of Seattle v. Rogers Clothing for Men, Inc.*, 114 Wash.2d 213, 787 P.2d 39 (Wash. 1990) (en banc), argued that all special assessments are for the *construction* of permanent local improvements. The court, though, rejected the notion that "local improvements" necessarily presuppose permanent physical additions, and specifically held that assessments on property owners within a Business Improvement Area for "decorating and beautifying public places in the retail core area, sponsoring public events, advertising, main-

taining information and directional signing for pedestrians, improving public relations, sweeping and cleaning sidewalks, cleaning and erasing graffiti, maintaining flowers and greenery, providing and cleaning litter receptacles and providing additional security" constituted special assessments. *Id.* at 45–46.

Similarly, in *Evans v. City of San Jose*, 3 Cal.App.4th 728, 4 Cal.Rptr.2d 601 (Cal.Ct. App.1992), the court concluded that state legislation which authorized the imposition of assessments on businesses for the purposes of "general downtown promotion, the furnishing of music, and other expenditures unrelated to capital improvements," while not a "true special assessment," was not a tax and thus was not subject to that state's requirement that imposition of local taxes receive the approval of two-thirds of the electorate. In reaching this conclusion, the court first undertook to explain the difference, under California law, between special taxes, regulatory fees and special assessments. "Special taxes," which were subject to the two-thirds approval requirement, were taxes levied for a specific purpose rather than a levy placed in the general fund for use for general governmental purposes; regulatory fees were fees charged in connection with regulatory services that do not exceed the cost of the service; and special assessments were described as charges imposed by a local district "'upon real property within a pre-determined district, made under express legislative authority for defraying in whole or in part the expense of a permanent public improvement therein.'" *Id.* at 607 (quoting *San Marcos Water Dist. v. San Marcos Unified School Dist.*, 42 Cal.3d 154, 161, 228 Cal.Rptr. 47, 720 P.2d 935 (1986)). The court then said:

The assessment on business for downtown improvement is not a true special assessment. It is neither a charge on real property nor is its purpose to pay for permanent public improvements specifically benefitting the assessed real property. However, the fact that it is not a true special assessment does not necessarily mean it is a special tax.... With [regulatory and development fees and special assessments], a discrete group receives a

benefit (for example, a permit to build or inspection of produce) or a service (for example, providing and administering a rental dispute mediation and arbitration hearing process) or a permanent public improvement (such as a local park or landscaped median islands on a local road) which inures to the benefit of that discrete group. The public as a whole may be incidentally benefitted, but the discrete group is specially benefitted by the expenditure of these funds. The public should not be required to finance an expenditure through taxation which benefits only a small segment of the population.

*Id.* at 607 (citations omitted). The court continued, saying:

The Legislature and city each determined that downtown businesses would be benefitted from establishment of a BID. The city specifically found "that the businesses lying within the Area will be benefitted by the expenditure of the funds raised by the assessments or charges proposed to be levied." The mayor of San Jose wrote Evans explaining that the BID would "provide funds to make a pleasant atmosphere for Downtown residents to live" and would "attract residents and patrons," obviously to the benefit of downtown landlords and businesses. The San Jose Downtown Association explained that the "objective of downtown revitalization will remain unchanged: to give more and more San Joseans reasons to come downtown to live, work, shop and play."

The Act challenged here is neither a true regulatory fee nor a true special assessment. *Nevertheless it is analogous to those other schemes which impose the financial burden for a special benefit upon the person or entity receiving the benefit* .... Under these circumstances, where the business license holder is specially benefitted, we hold that the assessment is not a "special tax" as contemplated by Article XIIIA of the California Constitution.

*Id.* at 607–08 (emphasis added).[5]

■ In the court's opinion, the conclusions reached by the courts in each of these cases are logically sound, turning, as they do, on the rationale underlying special assessments and the implicit recognition that the provision of services directed toward increasing the value of property in the affected area, including supplemental or augmented governmental-type services, is no less a "local improvement" than is a specific capital improvement. That is to say, this court is persuaded that where "services" are provided which are intended to enure to the special or peculiar benefit of property owners in a defined area and are for the avowed purpose of enhancing the value of the property located in that area, then such services may be funded through special assessments. And that is precisely what has occurred in the case of the Jackson Business Improvement District. The purposes for which the assessments involved in the case at bar are utilized or are to be utilized include supplemental police protection, street and sidewalk maintenance, additional trash collection and landscaping, as well as economic development and marketing/public relations. These services are intended for the benefit of those in the District, in the enhancement of the value

5. The case which plaintiffs cite as being "most persuasive" in support of their position, and which they characterize as being "on all fours" with the case at bar, *First United Methodist Church of Syracuse v. City of Syracuse,* 140 Misc.2d 200, 530 N.Y.S.2d 970 (N.Y.1988), is not at all persuasive to this court for, contrary to plaintiffs' reading of the case, the court in the *Syracuse* case did not even consider the issue confronting this court, i.e., whether assessments of the type here at issue would be properly considered to be ad valorem taxes or special assessments. Rather, the court held only that assessments sought to be imposed on property owners in a special assessment district of the City for subsidization of parking in the downtown area, increased security by the provision of auxiliary police, augmentation of clean-up services and publication and promotion of downtown events were void since the legislation which authorized the creation of the district provided assessments against district property owners for the limited purposes of constructing capital improvements and operating and maintaining such capital improvements and *for no other purposes. Id.* at 971. The court did not conclude, as plaintiffs assert, that special assessments cannot be used to fund auxiliary police protection, augmentation of clean-up services, promotion of downtown events and encouragement of economic development; rather, the court concluded only that it "must give effect to the Legislature's limitations on purposes for which special assessments may be imposed under the enabling act." *Id.* at 972.

of their property, so that, at least in theory, it is just and fair that the property owners in the District, rather than the public as a whole, bear the cost of these services.

Since the court concludes that the assessments in question are special assessments which are not subject to and hence do not violate the uniformity provisions of the state constitution, it follows that plaintiffs' equal protection claim fails as a matter of law. The court would say, however, that simply because it does not find the assessments at issue here unconstitutional does not mean that the court does not find the assessments unjust or inequitable. In fact, it has struck the court from the outset of this litigation that the method of funding for the described services, and in particular, the method of calculating assessments based strictly on gross square footage without regard to the use and/or value of the property involved, is patently unfair. However, this court sits not to remedy every inequity with which it is confronted, but only those that violate the law. And since the assessments provided for by the Act at issue in this case do not run afoul of the law, this court is without authority to offer plaintiffs a remedy.

For the foregoing reasons, the court concludes that plaintiffs' motion for summary judgment must be denied, and it is so ordered. It is further ordered that the State's motion for summary judgment is well taken and thus granted, and that plaintiffs' complaint will therefore be dismissed.

A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.